And, Counsel, if you want to reserve time, if you can let us know how much you want to reserve. Thank you very much. Good morning to each of your Honors. Appreciate your time this morning, your effort on this case, your indulgence, as well as that of your entire staff. My name is Michael Traylor. I represent a plaintiff and appellate in this matter. And we'd like to discuss some of what I believe are the key components of our argument here today without going through every piece of it. May it please the Court, for clarity's sake, the appellants are not contending that Allergan here was required to issue some additional warnings above and beyond what is required by the Food and Drug Administration. We do not contend that the state law claims pled in the action require that Allergan jump through some additional hoops that bump up against the requirements of the FDA-mandated warning. Our position on this matter is quite simple. And our position, as an aside, offends my mother's career, commitment to education, and my own bachelor's degree in English. Our position is that Allergan has a duty and an obligation not to unwarn the public and doctors. Traditional off-label marketing cases occur when a pharmaceutical company has promoted a drug for use which it has not been approved of. Our position in this matter is that what Allergan did here was much more dangerous and much more offensive to the law. What they did here was undermine that warning, take actions to discredit the efficacy of that warning, and counter what the FDA sought to accomplish when they required that black box warning on the drug. This case is not about any law of the state of California bumping into the Food, Drug, and Cosmetic Act. It's about Allergan tampering with that warning and their voluntary affirmative conduct in undermining that warning. Most of the district court's analysis and orders on this matter, as well as Allergan's pleadings and brief on this matter, are dedicated to the FDCA process, the history of Lexapro. But the complaint is more focused on, again, the voluntary affirmative conduct of the defendants, Allergan in this matter. And can you, after Allergan had settled with the federal government, what are the specific activities or statements that Allergan made that you think are objectionable? Sure. So what they did, and we believe this is properly alleged in the complaint, proceeded with the marketing of Allergan as a safe drug for adolescents, undermining that warning that it was very dangerous. Now, it wasn't prohibited, obviously, because it was issued, but that black box warning was undermined by them continuing to say that this is a safe drug for adolescents. That, for them not to alter their sales approach on the drug once the black box warning was issued, undermines that warning. And when you say the marketing, is there something specific you can point to? Sure. I mean, we laid out an entire marketing scheme, and they just continued to promote it as the go-to drug for adolescents suffering from these major depressive disorders. Without regard to the fact that it had this high level of danger to these teenagers and young adults. So the purpose of the corporate integrity agreement, and hopefully of the fines, was for them to stop marketing the drug as a safe drug. Did they transgress the agreement? We believe they did. How? We believe they did by, again, not issuing the letters, and this was in our prior version of the complaint, and the court dismissed that because what we alleged was that my clients were third-party beneficiaries of that corporate integrity agreement. But the corporate integrity agreement required them to disseminate information to doctors so that they would know that something has changed. Allergan is, I mean, Lexapro is no longer this drug that everyone believes is fine to give to teenagers. There is now a black box warning saying that this is a deadly drug and that extra precautions must be taken. And they were supposed to distribute information along that and send out letters to all their salespeople and letters to the community. And with the same vigor that they promoted the drug as being, you know, the go-to drug for depressive disorders, they were supposed to take some action to counter that opinion, and they did not do that. And, in fact, what we allege is in their marketing scheme they went out and said that the drug continues to be as safe as it ever was. I hope that answers your inquiry. Is there any case law you would point to that would uphold the proposition that there's a cause of action even when the required warning has been given? Yes, I believe that the Wyeth case points that out, that when you have these negligence and fraudulent conduct that is occurring that does not require the defendant to do something different than what the FDCA requires her to do, that those claims are actionable. And that's where the breadth of our reliance is. There is no California law that says, like many of the earlier preemption cases, that says in addition to whatever the FDA requires, you must do X, Y, and Z, right? But California has consumer protection laws that says you can't commit fraud. You can't undermine that warning, and that is our contention on exactly what they did. Don't you have a causation problem here on both of your claims? I mean, this young man passed away, I think, two or three months after he took the drug, and there was a period of time well in advance of that that's a predicate to your claims here. I don't see where there's a hookup, I guess, or causation between his death and what you're alleging here. I don't believe we have a causation problem. The allegations were that Kennedy had, and she was a young girl just for the court's information, she had a history of a depressive disorder, and it was treated with other drugs and therapy without a problem. She had some minor incidents, but never attempted such a drastic act of attempted suicide until the Lexapro was prescribed. And there's some other contributing factors as far as the dosage and things of that nature, which aren't really Aladin's problem, but most of those suicidal incidents happen shortly after someone stops taking a prior drug and starts taking the Lexapro. So the only change was the introduction of this drug. She had not been on it for a very long time. Well, under the California unfair competition law, do you need to have a causal connection for you to have a cause of action? Absolutely. Whether it's negligence or under the California law, you would have to have causation established one way or the other, right? We believe causation is required. We believe we allege sufficient facts to establish, to get past a motion to dismiss on causation, and certainly acknowledge the most difficult part of our case, of course, is proving that that was it. But we have experts in that regard, and we're confident that we can show that. So you have a general allegation of causation under both theories, I guess, right? But nothing more specific than that. Well, right. The causation argument or position is that the drug was introduced, and the drug creates these suicidal ideations that she was not able to resist. It is not a very complex causation argument. It is that the drug had that impact on her, and historically she had not had that problem. So everybody who took that drug and passed away months later, causation is automatically established? Absolutely not. I believe that someone had a history of being on a, a history of these type of depression, and the change was they took Lexapro, and that Lexapro caused a different outcome, which was these uncontrolled. But in light of the label, I don't see how you can establish causation. I mean, the drug was purchased. She took it. They have the big black label warning. Where do you get the causation out of this? Sure. The causation is because the conduct is alleged when we talk about the marketing scheme that Lexapro engaged in, whether the drug would have been prescribed in the first place if people were aware of those warnings, whether the pharmacist would have had the information to, there's certainly a question and another action on whether or not the drug had been supplied. But what happened is because Lexapro has such a long history, it was generally accepted as the go-to drug for these types of situations. And they, Allergan maintained that misnomer in the marketplace. I guess I don't get it. You have this enormous warning. Doesn't that break the causation change? I mean, it's right there. You read it. It tells you don't take this drug if you have these problems. I don't see how you can establish causation out of that. I understand the position. We respectfully disagree because people are still relying on their physicians and whatnot, and especially a minor on reading the label. People trust their physicians and are aware of the side effects. The warning says it may have or can have those side effects, right? But the fraud that occurred occurred prior to that. So we're not challenging the FDCA or its processes in having a drug approved. We're not asserting that California law required Allergan to do something different. However, we're asking the court to not reduce the serious allegations against Allergan and their marketing scheme as a simple duty to warn. We're asking to allow the legal process to hold them accountable for their conduct and undermining the very thing that the FDA sought to accomplish when they required the black box warning for Lexapro. Thank you. Good morning. May it please the court. John Ipsarro from Ulmer & Byrne on behalf of Allergan, Inc. and Allergan Sales. I don't have lengthy prepared remarks today. I'm prepared to entertain Your Honor's questions. You perceived and Mr. Traylor conceded again some issues that I think have significantly narrowed the scope of the appeal. Before I get into those, I do want to express my condolences to Stephanie Patton and Kendrick Knighton. The suicide of their daughter was a tragedy. The company acknowledges that. There just isn't a legally cognizable claim here for reasons I'm beginning to perceive that Your Honor's perceive. Well, let's start with the contention that the label is what it is, but it didn't undo either the marketing efforts of the company prior to the agreement that was subsequently reached with the government and that the company did not fulfill its responsibility under the subsequent agreement with the government. As a result, it is alleged dispensers of the drug, prescribers of the drug, and perhaps even takers of the drug weren't properly informed of the risk. What's your response to the argument? Well, the conduct that was alleged to have occurred in the late 1990s and early 2000s is incredibly remote to what transpired here, and an awful lot transpired in the interim. In fact, in the late 1990s, early 2000s, there was no express warning for suicidality. The FDA undertook an extensive, years-long analysis of the issue, multi-analyses of all the clinical trials in multiple populations. They started with the pediatric and adolescent population. They ultimately moved on to the adult population. From 2004 to 2007, the FDA crafted the warnings. These are FDA-crafted warnings that apply to the entire class of drugs. It was widely publicized. The likelihood that there's a physician in the United States that prescribes any antidepressant doesn't understand that there's this black box warning for suicidality associated with adolescents and young adults up to age 24. It's just not reasonable in the context that we've all come to. That's a factual proposition. Is that one we can take up at this point? That is that a physician has to be aware. Well, how do we know at this stage a physician has to be aware? Well, I guess you asked me why would that conduct? I mean, we're hearing a motion to dismiss. Yes, Your Honor. It may well be the case that the publicity, particularly within the medical field, that attached to this drug is such that those who prescribe the drug, those who dispense the drug, were aware of the risk, aware of the warning, and it's a risk that the FDA decided was worth bearing. But the allegation, as I understand it from plaintiff, is that marketing efforts, either marketing efforts before, and I confess I may not be articulating this very well, but marketing efforts before and marketing efforts or failure to undertake some kind of corrective efforts afterwards permitted this condition to exist, that is a condition whereby somebody prescribing or dispensing the drug might not have been aware of the increased risk. The alleged conduct that was in the late 1990s and early 2000s had nothing to do with suicidality. The alleged conduct had to do with the promotion of primarily Celexa, precursor to Lexapro, and Lexapro, that the drug was effective in adolescents. And that takes us to an interesting point in response to a point that Mr. Traylor made, that force promoted the drug as safe. Well, after the black box warnings were implemented in March of 2009, seven years before Lexapro was prescribed to Kennedy, the FDA decided that notwithstanding that risk, notwithstanding those warnings, the drug was safe and effective as labeled to treat adolescent depression. It was only the second drug on the market to ever receive that approval. Fluoxetine, Prozac, was the first. So it's the only other drug on the market besides fluoxetine that is approved to treat adolescent depression. So the FDA's, and this is all in the record, you know, the FDA made that decision. And when Mr. Traylor and plaintiffs talk about marketing the drug as safe, I believe you have perceived this. I mean, there isn't a single promotional piece in front of the court. There's not a single statement from a sales representative or any other company representative that's been indicated, that's been put before the court or represented, was made. There's just simply no fact to support any of the conclusory laundry list of allegations and parade of horribles that are in the complaint. The allegation that Forrest didn't comply with the corporate integrity agreement, well, Judge Fitzgerald notes in his decision that that agreement was discharged in 2015. It's not plausible that the federal government, that our allegant, entered into a corporate integrity agreement with the United States government that lasted for five years, didn't comply with it for those five years, the allegation is we didn't do any of the things that the corporate integrity agreement required us to do, yet in 2015 the agreement ended. None of that is plausible. And you're not, Judge Fitzgerald was not, and you are not required to assume the truth of that allegation, particularly in light of the absurdity of the allegation, in light of, you know, what is known to have transpired and is a matter of public record and is in the record in this case. Setting aside any potential preemption issue, does the warning by itself negate what the plaintiff claims has been years or decades of misleading advertising? I guess another way to put it is maybe hypothetical is, say, you know, aspirin, which people believe and assume it's safe to, you know, for headaches and, you know, aches and pains. And suppose the company realizes that there is a high risk of heart disease if you take aspirin. So they put a warning on it. But then there has been decades of advertisement and marketing of aspirin as safe. Does the warning itself negate, under California law, say decades of misleading advertisement that the plaintiff alleges? The warning is adequate as a matter of law. Judge Fitzgerald found that appropriately. To answer your question, it would depend on the conduct alleged. In this particular case, there is nothing other than conclusory allegations that this took place. And, again, it goes to the absurdity, the plausibility of what the plaintiffs allege, Your Honor. If we could please get context specific and talk about this case, if you'll indulge me. The allegation is that the company spent hundreds of millions of dollars over 15 years undermining an FDA mandated warning for suicidality. That's the allegation in the case. Yet nowhere in the complaint does plaintiff identify a single statement that was made, the content of any misrepresentation, who said it, when they said it, to who, who relied on it, why. I mean, all of the complaints have always been, that's why Judge Fitzgerald appropriately dismissed the action, that outlines what it is this conduct consisted of. And if you think about it in terms of the extravagant allegations that are being made here, that this occurred over 15 years, hundreds of millions of dollars, and the plaintiffs can't come up with a single example, not one, of where this took place that they can put in the complaint? For five years during this period of time. The company is subject to the corporate integrity agreement. Every single marketing piece that the company uses is submitted to the FDA on a form 2253. I have the regulation, I could read it to you. But, I mean, this is a highly, highly regulated industry. The notion that hundreds of millions of dollars of efforts undermining the suicide warning went on for a period of 15 years and no one noticed to the point that plaintiff has some facts, I would be standing in front of the government right now trying to explain that conduct if it occurred, Your Honor. It didn't occur. It's not plausible. And in order to meet their pleading burden, Mr. Taylor has conceded that we are now at the point where he's abandoned the inadequate warning claim. I mean, that was extensively argued below, and we're finally at the point that we recognize that two black box warnings and nine other paragraphs directed to suicidality is inadequate warning related to this particular risk. But there's just no basis, there's no plausible basis and certainly no facts in any of the complaints, aside from conclusory allegations that here are the corporate integrity agreement obligations, you didn't do any of them. Yet, in 2015, the corporate integrity agreement ends. It's not plausible in this particular context, Your Honor, if that answers your question. Thank you. I'm reviewing my notes because much of what I expected to cover, the concessions by the plaintiff that they're fraud police claims, already was covered in Your Honor's questions. And I'm not going to go on at any great length. I would like to point out that the plaintiff has abandoned their negligence claims at this point. All that's left are claims of intentional fraudulent conduct, whether they're put under the bucket of alleged off-label marketing or put under the bucket of other conduct undermining the warning. And as a result, and the plaintiff concedes as well, that the heightened pleading requirements of Rule 9b apply in this case. I mean, for all of the allegations, he's got to show the who, what, where, when, how, why of what transpired. If you don't have any other questions. Thank you. I greatly appreciate your time and attention. Thank you again. Just a couple of points I'd like to make. The history of Lexapro is significant historically by way of background. I mean, this is a situation where a company faced quasi-criminal proceedings, was fined a very large amount of fines for the conduct and basically doing the same thing that is alleged here. Our position is that they continue to do a different variation of off-label marketing, even after they were fined and held and required to add this black box warning on the drug. It's not that they permitted the prior thoughts and feelings about Lexapro being safe for teenagers to exist, right? They affirmatively went after it. They took actions to make sure that the marketing and the promotion of this drug was effective. The reputation, I should say, of this drug as the go-to drug for these types of situations was maintained, despite the black box warning. Our position is not that they stood idly by. Our position is they took voluntary affirmative actions to actually undermine and take the legs out of that black box warning. What facts have been alleged in the complaint that makes that allegation plausible? We have, I believe it's nine paragraphs with subsections in the complaint that describe a marketing scheme where they continued to go out and market this drug as safe specifically for adolescents to hold these seminars that they will hold and do continuing education and things of that nature. The marketing scheme that we lay out in the Second Amendment complaint is very lengthy and detailed. Now, we have not conducted discovery. So, you know, do I have the smoking gun that we're, you know, a corporate memo that says, you know, we're going to continue to do this despite the black box warning? No, I don't. But we are in the early pleading stages of this matter. And I don't believe I was required at the point the dismissal occurred to respond in a motion for summary judgment-like fashion with that evidence when we had not conducted discovery. Well, let's just pick the example identified by your colleague, which is that the FDA dismissed or federal government dismissed the agreement, and I think he said 2015, I've forgotten the year. That would seem to suggest that the federal government was not dissatisfied with defendants' compliance with the agreement. What supports the proposition that the federal government was wrong, that Forrest did not comply with its obligations? I mean, you know, unfortunately and transparently, the short answer is I don't know. I don't know why they dismissed it when they did. It isn't a problem. Under ICFAL, you've got to give us enough facts to make the allegation plausible. What facts are there? I agree. I think the facts that are alleged in the complaint are sufficient. The fact that the federal government terminated the CIA in this case is, one, there's no evidence. I mean, it was not an evidentiary proceeding. And quite honestly, I can't tell you the state of mind of the federal government in saying you had done enough. It could have been that they paid the fine. I just don't know that information. But what we do know and what we have asserted in this case is they continue to go out and speak to doctors and speak to pharmacists about this drug in a manner to undermine that black box warning. Twombly and ICFAL produced a sea change, and we can like it or not like it, but the Supreme Court's requiring some specifics, even more when you're dealing with an allegation of fraud. And I've gone through the complaint. I see the broad allegation about how defendants have done this and haven't done that. I don't see any facts. Are there any facts? We believe that we laid out sufficient facts. Can you point to something? I would have to take a second. All right, I understand. I mean, if there's something here, I want to know it. But right now, I've got to tell you my impression is that there aren't specific facts alleged in the complaint. So the defendant's argument that the plausibility requirement of ICFAL hasn't been satisfied seems to have some traction. So if you've got something I can take a look at, I'd like to do so. Yes, I understand. Thank you. I believe we start on paragraph 39 of the second minute complaint. We there talk about the efforts of Allergan and the marketing of Lexapro is safe for adolescents. In paragraph 40, we talk about their efforts to gain a competitive edge. I'm sorry, in 41, a competitive edge over other companies that were developing antidepressants, which were generating revenue as well. Well, I'm looking at those paragraphs. I see allegations, but I haven't seen facts. And that just may be a different understanding of what the pleading requirements are, but that's my concern. I understand. And I believe it goes on, and I'm sure you've had a chance to look at it. That may be, but I would then argue certainly there's sufficiency for leave to amend to add those more detailed specifics of, you know, where a sales conference may have been or who spoke at that sales conference and things of that nature. And would ask the court, if that is what the analysis today boils down to, that we do believe the liberal amendment policy would allow us leave, so allow us leave to amend to allege those, you know, who those speakers were and what they spoke at what conferences and things of that nature. Thank you. Thank you. The case has been submitted.
judges: Clifton, Block, Lee